MURDOCK, Justice.
The Town of Summerdale ("Summerdale"), the City of Robertsdale ("Robertsdale"), and Baldwin County Sewer Services, LLC ("BCSS") (hereinafter referred to collectively as "the petitioners"), independently petitioned this Court for a writ of certiorari seeking review of the decision of the Court of Civil Appeals in East Central Baldwin County Water, Sewer & Fire Protection Authority v. Town of Summerdale , 252 So.3d 98 (Ala.Civ.App.2015) ("ECBC"). In that decision, the Court of Civil Appeals concluded that the petitioners lacked standing to file actions against the East Central Baldwin County Water, Sewer and Fire Protection Authority ("ECBC") and the Baldwin County Commission ("the county commission") seeking a judgment declaring that two amendments to the articles of incorporation of ECBC approved by the county commission-one in 2002 and the other in 2008-were void. We granted the petitions except with regard to Summerdale's challenge to the 2008 amendment.[1] Because we conclude that the petitioners have standing, we reverse the decision of the Court of Civil Appeals.
I. Facts
In October 2009, Summerdale, Robertsdale, and BCSS each filed a declaratory-judgment action against ECBC and the county commission in the Baldwin Circuit Court challenging the two amendments to ECBC's articles of incorporation; those actions were consolidated. The first amendment, approved by the county commission on February 19, 2002, expanded the geographical service area of ECBC ("the 2002 amendment"). The second amendment, approved by the county commission on September 16, 2008, expanded the services ECBC could provide in its service area to include sewer services ("the 2008 amendment"). The opinion of the Court of Civil Appeals provides many of *114 the facts pertinent to a resolution of this matter:
"The following facts were set forth in Summerdale's complaint[2] and stipulated to by ECBC:
" 'ECBC is an Authority organized under Article 1, Chapter 88, Title 11, Code of Ala. (1975), as amended.
" '....
" '... On or about February 4, 2002, the Board of Directors of ECBC ... adopted a resolution proposing another amendment to the Certificate of Incorporation for the purpose of enlarging ECBC's service area to include certain additional territory for the purpose of providing water and fire protection services.
" '... On or about February 5, 2002, the Board of Directors of ECBC filed a written application with [the county commission] describing the proposed amendment and requesting that [the county commission] adopt a resolution declaring that it had reviewed the contents of the application, and after review, had found and determined as a matter of law that the statements contained in the application were true.
" '... On or about February 19, 2002, [the county commission] ... adopted a resolution in which it declared that it had reviewed the contents of said application, and after the review, had found and determined as a matter of law, that the statements contained in said application were true.
" '... On or about March 28, 2002, an Amendment to the Certificate of Incorporation of ECBC was recorded in the Office of the Judge of Probate of Baldwin County, Alabama, Instrument Number: 650808. Said Amendment added additional territory to ECBC's service area.
" '... On or about June 10, 2008, the Board of Directors of ECBC adopted a resolution proposing another amendment to its Certificate of Incorporation to make provision for the operation of a sewer system and requested that its name be changed to East Central Baldwin County Water, Sewer and Fire Protection Authority. The request was for all of the lands in its service area except for those areas already being serviced by BCSS....
" '... On or about June 18, 2008, the Board of Directors of ECBC filed a written application with [the county commission] which described the proposed amendment to the Certificate of Incorporation and requested that [the county commission] adopt a resolution declaring that it had reviewed the contents of the application and, after review, had found and determined as a matter of law that the statements contained in the application were true.
" '... The application states that "there is no public sewer system adequate to serve the territory in which it is proposed that [ECBC] will render sewer service."
" '... [The county commission] approved the application by adopting a resolution on about September 16, 2008.'
"Further, the evidentiary materials submitted by the parties indicate the *115 following. David Wilson, the mayor of Summerdale, testified in his deposition that, in 2002, Summerdale did not have definite plans to service the ECBC 2002 expanded service area. He testified that whether Summerdale would do so would depend on need and whether it was economically feasible to do so. He testified that Teresa Lucas, the engineer for ECBC, and Roy Dyess, a director for ECBC, had explained to the Summerdale city council before the adoption of the 2002 amendment that, if Summerdale ever annexed portions of the ECBC 2002 expanded service area into the city, Summerdale would have the option to purchase ECBC's system or lay water lines parallel to ECBC's lines. Wilson testified, and the minutes of the February 11, 2002, Summerdale city council meeting reflect, that he repeated Lucas's and Dyess's explanations at the council meeting and that Lucas had not objected to his statement. He testified that he had since learned that the federal statute under which ECBC has borrowed money prohibits parallel lines. John Resmondo, the manager of the public works for Summerdale, also testified that Summerdale could not afford to run water lines in the ECBC 2002 expanded service area.
"Charles Murphy, Robertsdale's mayor, testified in his deposition that he had not known what ECBC's service area was until 2005. He testified that Robertsdale had water lines that were located in the ECBC 2002 expanded service area before the 2002 amendment. Murphy testified that Robertsdale had had over 12 customers in one section of the ECBC 2002 expanded service area since 1994 or 1995, over 6 customers in another section since before 1994, about 10 customers in another section, and over 20 in another section. He testified that, at the time of the 2002 amendment, Robertsdale did not have definitive plans to offer further water services in the ECBC 2002 expanded service area. Since that time, Robertsdale had sought to purchase a portion of ECBC's service area. He testified that, at the time of his deposition, Robertsdale did not intend to provide services in the northern portion of the ECBC 2002 expanded service area unless it could make money there and that he did not expect that to happen in the foreseeable future. He testified, however, that if there were sufficient customers to pay for the cost of the expansion to get the desired rate of return, Robertsdale's system would have adequate capacity to provide water services in the northern portion of the ECBC 2002 expanded service area.
"Murphy testified that ECBC's authority to provide sewer services in its service area would pose a problem because ECBC would try to charge a franchise fee if Robertsdale were to seek to install sewer lines in the ECBC 2002 expanded service area.
"Murphy testified in his affidavit that 'ECBC's service area has been extended to include approximately one third (1/3) of Baldwin County, including the logical and abutting areas of [Robertsdale] and other service providers.' He further testified that, before the 2002 proposed expansion of the water-service area by ECBC, Robertsdale's 'water capacity and service capability quadrupled ECBC's existing water capacity and service capability.' He testified that, '[p]rior to the 2002 expansion request by ECBC, no one from ECBC ... came before a Robertsdale work session or city council meeting with any details of a proposed water expansion area or a map outlining their intentions.' He testified that, had he known the specifics of the proposed plan, he would have requested *116 that the Robertsdale city council oppose the expansion. He testified that 'Lucas[ ] met with [him] and explained that she worked for ECBC and they were considering putting some water somewhere east of Robertsdale, but [that she had] never produced a map with these exact details. The primary purpose of the meeting ... was that she wanted to introduce herself ... to solicit work from the City Of Robertsdale.' He testified that the first he had learned of the details of the 2002 expansion was in 2005 when he discovered that an area that Robertsdale was trying to provide service to was part of ECBC's service area. He testified that the ECBC 2002 expanded service area included Robertsdale's existing sewer-treatment plant where Robertsdale was already providing water. He testified that, '[p]rior to the 2002 expansion request by ECBC, ... Robertsdale was ready and adequate to provide water service to the [ECBC 2002 expanded service area].' Murphy also testified that, before the 2008 amendment, Robertsdale's 'sewer capacity and service capability dwarfed ECBC's existing sewer capacity and service capability ... [and] was ready and adequate to provide sewer service to the area encompassed by ECBC.'
"Wilson also testified that Summerdale had entered into an agreement on July 27, 2007, with BCSS to provide sewer services. Murphy testified that he did not want ECBC to have sewer authority because, he said, if Robertsdale were to annex any of the areas in the ECBC service area, Robertsdale would have to pay ECBC a franchise fee. Charles Hall, the manager for ECBC, testified that ECBC had borrowed money from the United States Department of Agriculture to construct its water system in the ECBC 2002 expanded service area. Hall testified that ECBC has the capacity to provide water services, but not sewer services, throughout its service area. He testified that ECBC was servicing all the parts of its service area where people had requested water services except a few places where it had not been feasible. He testified that ECBC has a protected service area regarding water services due to its agreement with the United States Department of Agriculture.
"Hall testified that, in 2005, ECBC had contracted with Alabama Utilities Services, Inc. ('AUS'), to provide sewer services in ECBC's service area but that that contract had expired. Hall testified that, on January 1, 2009, ECBC had entered into a franchise agreement with Integra Water Baldwin, LLC, to provide sewer services in ECBC's service area and that that franchise agreement was still in effect. He testified that, before the 2008 amendment, ECBC did not have an agreement with any provider to provide sewer services.
"Lucas testified by deposition that Wilson had dropped his objection to the 2002 amendment at the public hearing before the Summerdale city council. She testified that Summerdale and Robertsdale had been aware of the 2002 amendment and that neither city could adequately provide water for the ECBC 2002 expanded service area because none of them were providing it at the time. Lucas testified that she had met with Murphy before the 2002 amendment and that he had said that Robertsdale could not provide water services to the ECBC 2002 expanded service area. She testified that she had assured Murphy that the expansion would not affect Robertsdale's ability to annex parts of that area and that Murphy, therefore, had had no concerns about the amendment.
*117 Lucas testified that there was no demand for sewer services in ECBC's service area.
"Lucas testified in her deposition that the 2002 expansion had taken ECBC's service area up to the city limits of Summerdale and Robertsdale, where those cities stopped providing water and sewer services. Lucas testified that, in July 2003, ECBC had obtained a 'Rural Utility Service Loan' from the United States Department of Agriculture in the amount of $3,037,500, and a grant in the amount of $2,362,500 for part of the 2002 expansion. She testified that she had known that no city would be able to lay a parallel water line once ECBC obtained a federal loan for its water system.
"In 2008, Robertsdale, Summerdale, and BCSS objected to the county commission's approving ECBC's application regarding the 2008 amendment. Two work sessions and one public hearing were held concerning the application. The minutes from those meetings reflect that Bob Willis, from ECBC, represented to the county commission that ECBC did not intend to actually provide sewer services in its service area and that ECBC did not have any definite plans for contracting to provide sewer services. Willis stated that ECBC did not intend to stop providers from servicing ECBC's service area but that he wanted providers to come to ECBC for oversight so that ECBC could realize revenue. Willis noted that ECBC had not sought to provide sewer services in the few places in its service area where there were existing sewer lines from other providers. Dan Blackburn, a representative of BCSS, stated that BCSS and some municipalities have sewer lines in the ECBC service area and that BCSS had the ability at that time to expand sewer services throughout ECBC's service area. Larry Sutley, a representative of Summerdale, stated that Summerdale and all the other surrounding cities had plans to expand sewer services into the ECBC service area. A representative of Robertsdale stated that Robertsdale had the same plan that ECBC had-if there is a need, it would provide sewer services in the ECBC service area. He stated that Robertsdale had the capability to do so.
"On November 17, 2008, ECBC demanded that BCSS 'submit to it any and all plans and specifications concerning the placement and construction of sewer lines for which it has received permitting from Baldwin County and, further, that no action be taken by BCSS to construct or put said lines into place until ECBC has had an opportunity to review said plans and specifications.' It also requested that 'any plans for the placement or construction of sewer lines and/or sewer systems within ECBC's service area be submitted to it prior to making permit application with Baldwin County.' Finally, it requested that no 'permits for any portion of a sewer system to be located in our service area be issued by the [county commission] without prior approval from ECBC.'
"ECBC stipulated: 'It is undisputed that at the time ECBC made application to [the county commission] in 2002 to expand its service area that there were a number of small pockets where the City of Robertsdale actually had some water lines in the ground. The total number of customers was probably less than twenty-five (25).' "
ECBC, 252 So.3d at 106.
Our review of the record reveals additional facts that are pertinent to the resolution of this matter. Particularly, with regard to Summerdale, in addition to challenging *118 the validity of the amendments, Summerdale alleged in its complaint that ECBC had breached a franchise agreement with Summerdale that concerned ECBC's providing water services to a housing subdivision, known as Shadyfield Estates, located within the corporate limits of Summerdale. Summerdale's claim of breach of the franchise agreement remains before the trial court because the parties agree that it is a separate claim as to which Summerdale has standing. The facts involved in that claim, however, do touch on one of Summerdale's standing arguments; therefore, the Shadyfield claim needs to be explained in further detail.
In its complaint, Summerdale explained that in January 2004 it "annexed the Shadyfield Estates area as a subdivision of the municipality." In May 2004, Summerdale "granted a franchise to ECBC for the specific purpose of supplying water service to said subdivision for a period of forty (40) years from the date said franchise was accepted by ECBC." Part of the terms of the franchise agreement "required ECBC to submit detailed plans and specifications of any proposed work within [Summerdale]." Summerdale alleged that,
"[l]ater, ECBC expressed an intent to extend service to two additional properties near Shadyfield Estates. [Summerdale] requested that ECBC draft an amendment to send to [Summerdale] for consideration by the Council and to have the County Commission extend the service franchise area to cover those properties, and to supply [Summerdale] with an exhibit showing the approval of the County for said extensions."
Summerdale further alleged that on January 4, 2008, it informed ECBC that it was in violation of the franchise agreement because, among other things, it had failed to pay the franchise fee and to provide the required documents for its further expansion plans. Subsequently, Summerdale informed the county commission "of the problem with ECBC in the Shadyfield Estates Subdivision and stated it had learned that ECBC had not only violated the franchise agreement but had continued to extend lines within [Summerdale's corporate] limits without [Summerdale's] knowledge or approval." The Shadyfield Estates area was located within that portion of ECBC's service area added by the 2002 amendment.
With regard to Robertsdale, as noted, its mayor Charles Murphy testified that before the 2008 amendment Robertsdale's "sewer capacity and service capability dwarfed ECBC's existing sewer capacity and service capability" and that Robertsdale's sewer-treatment plant was located within ECBC's expanded service area. Murphy testified that Robertsdale's sewer-treatment plant has been in the same location since 1979 and that Robertsdale was capable of providing sewer service to residents in ECBC's expanded service area.
Finally, the head manager of BCSS, Clarence Burke, Jr., testified that the reason BCSS purchased Summerdale's sewer system was that doing so would give BCSS the ability to interconnect all of its systems but would require laying sewer lines through ECBC's expanded service areas. BCSS could not carry out that project absent approval from ECBC because of the grant of sewer service to ECBC in its expanded service area by the 2008 amendment.
In August 2011, ECBC filed a motion for a summary judgment pertaining to the petitioners' challenges to the 2002 amendment and the 2008 amendment contending that the petitioners lacked standing to challenge the amendments because, it argued, the petitioners had not "suffered any injury by the actions of [the county commission]
*119 in approving the Amendment to ECBC's Certificate of Incorporation in 2002 or 2008." This was so, ECBC argued, because the amendments only granted ECBC "the authority" to provide water and sewer services in the expanded area. ECBC insisted that "in and of themselves" the amendments did not interfere with any authority the petitioners might have possessed to run water or sewer lines in ECBC's expanded service area. ECBC argued: "In that Summerdale and Robertsdale could/would not provide water service to the new territory acquired by ECBC in 2002, they suffered no injury when ECBC's service area was expended." It was, however, ECBC's installation of water lines in its expanded service area that prevented Summerdale and Robertsdale from running their own water lines in the expanded service area.
The petitioners subsequently filed their own motions for a summary judgment in which they contended that the 2002 amendment was invalid because it had been granted based upon ECBC's false statement in its application that the expanded service area was "not served by any existing public water system." As noted in the rendition of the facts quoted from the Court of Civil Appeals' opinion, ECBC later conceded that this statement was, in fact, inaccurate because Robertsdale was providing water service to customers in the expanded service area at the time ECBC applied for the amendment. The petitioners likewise argued that the 2008 amendment was invalid because in its application ECBC asserted that "there is no public sewer system adequate to serve the territory in which it is proposed that [ECBC] will render sewer service." They contended that this was a false statement because, they say, the facts would show that both Robertsdale and BCSS had the capacity to provide sewer services in ECBC's expanded service area and in some cases already were providing sewer services to customers in the expanded service area.
On June 22, 2012, the trial court entered an order in which it concluded that the county commission had granted the 2002 amendment based upon false information and that therefore the amendment was due to be set aside. Based upon that conclusion, the trial court entered a summary judgment in favor of Robertsdale. ECBC filed a postjudgment motion. On September 24, 2012, the trial court entered an order in which it reaffirmed its conclusion that "the approval" of the 2002 amendment "was not valid," denied ECBC's "motion to reconsider the summary judgment," and noted that "[t]he parties stipulated that this order would apply to plaintiffs Town of Summerdale and Baldwin County Sewer Service as well." In the same order, the trial court certified its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P.
On October 23, 2013, the Court of Civil Appeals set aside by order the trial court's Rule 54(b), Ala. R. Civ. P., certification and dismissed the appeal because the judgment did not appear to adjudicate the petitioners' claims pertaining to the 2008 amendment. East Cent. Baldwin Cty. Water, Sewer & Fire Prot. Auth. v. Town of Summerdale (No. 2120106, Oct. 23, 2013), 171 So.3d 694 (Ala.Civ.App.2013) (table).
On March 11, 2014, the trial court entered an amended order in which it concluded that its order of September 24, 2012, should be amended because "the Summary Judgment order of this Court dated September 24, 2012 should have included and been applied to the 2008 amendment." On April 1, 2014, ECBC filed a postjudgment motion, which the trial court subsequently denied.
*120 On February 27, 2015, the Court of Civil Appeals issued its opinion that is the subject of these petitions. In a 3 to 2 decision, the Court of Civil Appeals concluded that the petitioners lacked standing to file their declaratory-judgment actions challenging the 2002 amendment and the 2008 amendment because, the Court of Civil Appeals reasoned, they had failed to establish the existence of an " ' "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " ' " ECBC, 252 So.3d at 107-08 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). Presiding Judge Thompson concurred in part and dissented in part with an opinion joined by Judge Pittman. The petitioners filed the petitions for a writ of certiorari with this Court seeking review of the decision of the Court of Civil Appeals.
II. Analysis
The sole issue before us is the determination by the Court of Civil Appeals that the petitioners lacked standing to challenge the amendments. " 'The issue of standing presents a pure question of law, and the [lower] court's ruling on that issue is entitled to no deference on appeal.' " Town of Mountainboro v. Griffin, 26 So.3d 407, 409 (Ala.2009) (quoting Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 953 (Ala.2004) ).
At the outset, we note that ECBC contends that these certiorari petitions were improvidently granted because, it says, the petitioners did not highlight a conflict between the opinion of the Court of Civil Appeals and previous cases from this Court. The conflict claimed by the petitioners was that the Court of Civil Appeals stated that the petitioners needed to establish that they had sustained an "injury in fact" in order to maintain their declaratory-judgment actions even though multiple cases from this Court have stated that " '[a]ll that is required for a declaratory judgment action is a bona fide justiciable controversy.' " Creola Land Dev., Inc. v. Bentbrooke Hous., L.L.C., 828 So.2d 285, 288 (Ala.2002) (quoting Gulf South Conference v. Boyd, 369 So.2d 553, 557 (Ala.1979) ). See, e.g., Muhammad v. Ford, 986 So.2d 1158, 1161 (Ala.2007) (stating that " '[f]or a declaratory-judgment action to withstand a motion to dismiss there must be a bona fide justiciable controversy that should be settled." ' (quoting Harper v. Brown, Stagner, Richardson, Inc., 873 So.2d 220, 223 (Ala.2003) )).
In contrast, the Court of Civil Appeals in this case relied upon Town of Cedar Bluff v. Citizens Caring for Children, 904 So.2d 1253 (Ala.2004), a case in which a group of citizens sought a judgment declaring a particular act unconstitutional under the Alabama Constitution. In Town of Cedar Bluff, the Court clearly stated that an injury in fact was part of the requirement for standing in a declaratory-judgment action:
" 'To say that a person has standing is to say that that person is the proper party to bring the action. To be a proper party, the person must have a real, tangible legal interest in the subject matter of the lawsuit.' Doremus v. Business Council of Alabama Workers' Comp. Self-Insurers Fund, 686 So.2d 252, 253 (Ala.1996). 'Standing ... turns on "whether the party has been injured in fact and whether the injury is to a legally protected right." ' [ State v. Property at] 2018 Rainbow Drive, 740 So.2d [1025,] 1027 [ (Ala.1999) ] (quoting Romer v. Board of County Comm'rs of the County of Pueblo, 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting)) (emphasis omitted). In the absence of such *121 an injury, there is no case or controversy for a court to consider."
904 So.2d at 1256. This Court restated the rule in similar fashion in Carey v. Howard, 950 So.2d 1131, 1134-35 (Ala.2006), Ex parte Richardson, 957 So.2d 1119, 1126 (Ala.2006), and Muhammad v. Ford, 986 So.2d 1158, 1162 (Ala.2007).
What the petitioners highlighted was-if not a strict conflict-at least a lack of clarity in our cases involving declaratory judgments that probably contributed to the Court of Civil Appeals' error in this case. A declaratory-judgment action is a unique form of action in that it is often filed before an actual breach of a right has occurred, and so an "actual injury" has not yet been sustained by the plaintiff. A declaratory judgment often seeks to avoid harm before it happens. The Declaratory Judgment Act itself states that "its purpose is to settle and to afford relief from uncertainty and insecurity with respects to rights, status, and other legal relations." § 6-6-221, Ala.Code 1975. This Court has explained: "It is true that 'declaratory-judgment actions are designed to be preemptive,' but this is because they seek to ' "set controversies to rest before they lead to repudiation of obligations, invasion of rights, and the commission of wrongs." ' " Ex parte Valloze, 142 So.3d 504, 509-10 (Ala.2013) (quoting Carey v. Howard, 950 So.2d 1131, 1134 (Ala.2006), quoting in turn Harper, 873 So.2d at 224 )).[3] But this characteristic of a declaratory-judgment action does not render the component of injury any less significant to a party's standing to bring the action. It simply means that the threat of injury needs to be imminent and tangible rather than purely speculative in order for there to be a bona fide justiciable controversy.
With respect to Robertsdale and Summerdale concerning the 2002 amendment, the Court of Civil Appeals focused solely on whether Robertsdale and Summerdale had definite plans to provide water services in the expanded service area in 2002, in addition to any customers they already had in that area. Because they had no plans to do so, the Court of Civil Appeals concluded that Robertsdale and Summerdale had not suffered a legally cognizable injury.
"Murphy, the mayor of Robertsdale, testified that Robertsdale had water lines in the ECBC 2002 expanded service area before the 2002 amendment was adopted. He testified that Robertsdale had had over 12 customers in one section of the ECBC 2002 expanded service area since 1994 or 1995, over 6 customers in another section since before 1994, about 10 customers in another section, and over 20 in another section. He testified that, at the time of the adoption of the 2002 amendment, Robertsdale did not have plans to offer further water services in the ECBC 2002 expanded service area. Wilson, the mayor of Summerdale, testified in his deposition that, in 2002, Summerdale did not have definite plans to service the ECBC 2002 expanded service area. John Resmondo, the manager of the public works for Summerdale, also testified that Summerdale could not afford to run water lines in the ECBC 2002 expanded *122 service area. Finally, BCSS does not provide water services at all.
"Based on the foregoing, we conclude that neither Robertsdale, Summerdale, nor BCSS has shown the existence of an ' "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " ' Lujan [v. Defenders of Wildlife], 504 U.S. [555] at 560 [ (1992) ] (footnote and citations omitted). Robertsdale and Summerdale both seek redress based on the fact that they might at some point in the future want to provide water services to the 2002 ECBC expanded service area. That injury is clearly hypothetical in nature. We also note that there is no indication that ECBC has sought to prevent Robertsdale from providing water services to its preexisting customers in the 2002 ECBC expanded service area. Therefore, we conclude that Robertsdale, Summerdale, and BCSS lacked standing to challenge the 2002 amendment and, thus, that the trial court should have dismissed their complaints to the extent that they challenged that amendment. [ State v.] Property at 2018 Rainbow Drive, 740 So.2d [1025] at 1029 [ (Ala.1999) ]."
ECBC, 252 So.3d at 108.
There are several problems with this analysis. First, standing concerns the actual legal interest of the litigant at the time the action is filed. " ' "A controversy is justiciable where present 'legal rights are thwarted or affected [so as] to warrant proceedings under the Declaratory Judgment statutes.' " ' " Ex parte Valloze, 142 So.3d at 509 (quoting Harper, 873 So.2d at 224, quoting in turn Creola Land Dev., 828 So.2d at 288, quoting in turn Town of Warrior v. Blaylock, 275 Ala. 113, 114, 152 So.2d 661, 662 (1963) (emphasis added)). Whether Robertsdale and Summerdale were capable of providing water services to the extended service area in 2002 does not address whether they had standing to file this action in 2009. Indeed, no party disputes that in 2009 Robertsdale and Summerdale were ready and able to provide water services in the expanded service area. ECBC's attainment of the 2002 amendment clearly affected their ability to do so.
Second, focusing on the ability to provide water services in the 2002 expanded service area ignores the tangible question for standing: Whether Robertsdale's and Summerdale's legal rights were thwarted or affected by the 2002 amendment. This Court has previously explained:
"Under present Alabama statutes, municipalities are authorized to expand, without restriction, their water and sewer systems outside their city limits. This authority has its origin in § 11-81-161(b) and § 11-50-5(a), [Ala.] Code 1975, which read:
" § 11-81-161(b) :
" '(b) Any county or incorporated municipality in the state that may now or hereafter own and operate a waterworks system, sanitary sewer system, gas system or electric system is authorized to improve, enlarge, extend and repair such system and to furnish the services, commodities and facilities of such system to domestic or industrial users or both within or without the limits of such county or municipality, as the case may be.'
" § 11-50-5(a) :
" '(a) Any municipality in this state may construct, purchase, operate, maintain, enlarge, extend and improve waterworks plants and systems or any part or parts thereof, whether located within or without or partly within and partly without the corporate limits of *123 such municipality. Such plants and systems may be purchased subject to encumbrances and to contracts to furnish water therefrom, the payment and performance of which may be assumed. Any municipality in this state may furnish and distribute, under contract, water to persons, firms and corporations in such municipality and to persons, firms and corporations in the territory surrounding such municipality, whether or not the territory surrounding such municipality is contiguous thereto.' "
Town of Loxley v. Rosinton Water, Sewer & Fire Prot. Auth., Inc., 376 So.2d 705, 707 (Ala.1979).
Thus, before the 2002 amendment was approved there is no question that Robertsdale and Summerdale had the authority to expand their water services into the expanded service area. The 2002 amendment clearly affected that authority, and the federal loan ECBC subsequently obtained to construct its water lines prohibited any competitors from laying water lines in the same area. There is no doubt that Robertsdale's and Summerdale's rights were affected in a manner sufficient to provide standing. As Presiding Judge Thompson cogently explained in his special writing in reference to Robertsdale:
"[The 2002 amendment] removes Robertsdale from the equation and forecloses it from offering additional water services in an area where it was providing services before the 2002 amendment. I make no judgment as to whether the 2002 amendment was proper. However, in my opinion, these facts present a " 'bona fide justiciable controversy," ' Creola Land Dev. [Inc. v. Bentbrooke Housing, L.L.C.], 828 So.2d [285,] 288 [ (Ala.2002) ], because Robertsdale's legal right to provide water services in the expanded service area has been ' "thwarted or affected." ' Id."
252 So.3d at 110 (Thompson, P.J., concurring in part and dissenting in part).
Third, the analysis of the majority in the Court of Civil Appeals ignores the fact that Summerdale alleged in its complaint that ECBC placed water lines inside Summerdale's corporate limits without Summerdale's permission. ECBC admits in its brief that, "if true, this may be a cognizable injury," but it argues that Summerdale did not plead "the same in this case and that is not part of this cause of action upon which standing [may] be brought." As we noted in our rendition of the facts, however, Summerdale did, in fact, plead this violation as part of its claims. This constitutes another basis for Summerdale's standing to challenge the 2002 amendment.
With regard to Robertsdale's challenge to the 2008 amendment, the Court of Civil Appeals reasoned:
"With regard to the 2008 amendment, we note that Murphy testified that Robertsdale had opposed the 2008 amendment because he could 'see that at some point in time in the future that [it] would present a conflict for my City' and that Robertsdale's plan was that, if there is a need for sewer services in ECBC's service area, it would expand sewer services to that area.... Therefore, we conclude, like we did with regard to the 2002 amendment, that Robertsdale and Summerdale have not shown the existence of an " 'injury in fact' "-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Lujan [v. Defenders of Wildlife], 504 U.S. [555] at 560 [112 S.Ct. 2130 (1992) ] (footnote and citations omitted)."
252 So.3d at 108.
Here again the Court of Civil Appeal erred by focusing entirely on whether *124 Robertsdale was actually about to provide sewer services into the expanded service area in 2008. The facts are undisputed that Robertsdale was capable of providing sewer services in the expanded service area-much more capable, in fact, than was ECBC-and that it already had done so for certain customers. Furthermore, as the Court explained in Town of Loxley, Robertsdale also had the authority-the legal right-to provide sewer services in the expanded service area. Despite all of this, because of the 2008 amendment, ECBC could impose a franchise fee on Robertsdale's provision of sewer services in the expanded service area. There can be no question that Robertsdale's rights were thwarted and affected by the 2008 amendment in a way that gives it standing to challenge the amendment.
We also must disagree with the Court of Civil Appeals' analysis concerning BCSS's standing to bring its declaratory-judgment action. The main opinion of the Court of Civil Appeals states:
"With regard to BCSS, we recognize that it does have plans to expand its sewer services in the ECBC service area. However, BCSS still must show that the 2008 amendment has affected it in that regard. Alabama Code 1975, § 11-50-1.1, provides:
" 'Municipalities are hereby prohibited from acquiring, or duplicating any services of, any waterworks system or any part thereof, operated by a corporation or association which has been organized under Sections 10-4-190 through 10-4-194, Sections 11-88-1 through 11-88-21, Sections 11-88-40 through 11-88-111, or Sections 11-89-1 through 11-89-19, [Ala.Code 1975,] without the consent of a majority of the members of the governing board of said corporation or association.'
"We note, however, that nothing in the record indicates that BCSS is a municipality or an agent for a municipality, see City of Wetumpka v. Central Elmore Water Auth., 703 So.2d 907, 914 (Ala.1997). Thus, BCSS is not limited by § 11-50-1.1. Further, although 7 U.S.C. § 1926(b) provides limitations regarding competition with associations such as ECBC that have obtained a loan from the United States Department of Agriculture, the record indicates that ECBC has not obtained such a loan to provide sewer services and there is nothing in the record to indicate that it has any plans to do so. Therefore, we cannot conclude that BCSS has been limited or will certainly be limited in expanding its sewer services in the ECBC service area and, thus, has sustained an injury in fact."
252 So.3d at 108.
It is undisputed that BCSS operates sewer services in the expanded service area and that it has plans to expand its sewer services in that area. It is also undisputed that ECBC has no plans to implement its own sewer services in its expanded service area but wishes to have control over how BCSS's sewer services will be implemented in the expanded service area and to charge BCSS a franchise fee for all customers it provides services to in the expanded service area. The threat of the imposition of the fee alone clearly is a threatened injury to BCSS's legal interests that gives BCSS standing to challenge the 2008 amendment. BCSS also purchased Summerdale's sewer system as part of its plan to interconnect all of its sewer services, a plan that cannot proceed without being affected by the 2008 amendment. This also constitutes a tangible interest that gives BCSS standing to challenge the 2008 amendment.
*125 Finally, we cannot agree with the Court of Civil Appeals' conclusion that BCSS lacked standing to challenge the 2002 amendment because BCSS does not provide water services. This rationale ignores the combined effect of the 2002 amendment and the 2008 amendment. Consequently, BCSS has the necessary interest in the validity of the 2002 amendment that expanded and now defines ECBC's service area for the provision of sewer services.
We emphasize here that we do not address whether the 2002 amendment or the 2008 amendment was proper. We are simply concerned with the judgment of the Court of Civil Appeals as to whether the petitioners have standing to challenge those amendments. We think it is clear that Robertsdale, Summerdale, and BCSS have standing to challenge the 2002 amendment and that Robertsdale and BCSS have standing to challenge the 2008 amendment. Accordingly, to that extent, the decision of the Court of Civil Appeals is reversed and the cause is remanded for further proceedings.
1140793-REVERSED AND REMANDED.
1140795-REVERSED AND REMANDED.
1140796-REVERSED AND REMANDED.
PARKER, MAIN, and BRYAN, JJ., concur.
BOLIN and SHAW, JJ., concur in the result.
STUART, J., recuses herself.

As will be explained infra, Summerdale sold its sewer system to BCSS and, therefore, no longer has an interest in providing sewer service.

The Court of Civil Appeals notes in its opinion: "Robertsdale's and BCSS's complaints are not in the record; however, the briefs filed with this court represent that the allegations in those complaints were the same as those in Summerdale's complaint except that they did not include the allegation regarding the breach of the franchise agreement." 252 So.3d at 100 n. 1.

The Court has also stated:
"[A] purpose of the Declaratory Judgment Act, codified at §§ 6-6-220 through -232, Ala.Code 1975, is 'to enable parties between whom an actual controversy exists or those between whom litigation is inevitable to have the issues speedily determined when a speedy determination would prevent unnecessary injury caused by the delay of ordinary judicial proceedings." '
Gulf Beach Hotel, Inc. v. State ex rel. Whetstone, 935 So.2d 1177, 1183 (Ala.2006) (quoting Harper, 873 So.2d at 224 (emphasis omitted; emphasis added)).